**UNITED STATES of America**

**v.**

**Carolyn S. McDANIELS et al.***

**Crim. No. 72–330.**

United States District Court,
E. D. Louisiana.

Dec. 2, 1973.

* Consolidated with: United States v. Gladys Fascio, Crim. No. 72–331; Deola R. Richardson, Crim. Nos. 72–332, 72–334, (two cases); Eartha St. Ann, Crim. No. 72–333; Audrey Lee Delair, Crim. No. 72–335; Maxine Smith, Crim. No. 72–336; Wilhemenia Brown, Crim. No. 72–337; Lorchid Goff, Crim. No. 72–338; Evelyna Bannister, Crim. No. 72–339; Diane Evans, Crim. No. 72–340; & Ella Rita Sanchez, Crim. No. 72–342.

James J. O'Connor, Asst. U. S. Atty., for United States.

Richard B. Sobol, New Orleans, La., Anne Pardee Buxton, New Orleans, La., Jack Greenberg, Charles S. Ralston, New York City, Richard T. Seymour, Washington, D. C., for defendants in Crim. Nos. 72–330, 72–332, 72–333, 72–334, 72–337, 72–338, 72–340 and 72–342, for defendants other than Althea Oates in Crim. No. 72–331, and for defendants other than Samaria Lambert in Crim. No. 72–335.

Louis A. Gerdes, Jr., New Orleans, for Althea Oates.

Ernest L. Jones, New Orleans, for Anna Jones Perkins.

Joseph A. Barreca, New Orleans, for Christine Walker.

Lynne Rothschild Stern, for Samaria J. Lambert.

ALVIN B. RUBIN, District Judge:

By motions to dismiss the indictments and to stay proceedings, defendants challenge the court's jury selection plan on the ground that the plan results in substantial underrepresentation of both black and poor persons and thus fails to comply with the Federal Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq.

The Jury Selection Act requires that the juries be "selected at random from a fair cross section of the community in the district or division wherein the Court convenes." 28 U.S.C. § 1861. It does not contemplate that the jury be selected from a list of names that is the quintessence of the community, nor that the list be a statistical apotheosis.

Its premise is that voters registration lists normally constitute a fair cross section of the community. It requires the list to be supplemented in some instances, where necessary to foster the policy and protect the rights secured by the Act. The defendants' motion urges that in this district the list is improper unless supplemented by the names of additional black and poor persons.

The challenge has been documented with admirable skill and painstaking thoroughness. It is denied because the plan does not appear, in the final analysis, to result in a substantial underrepresentation of black persons and because the Jury Selection Act of 1968 does not require that the voters list, from which jurors are to be selected, constitutes a cross section of the various strata of the population classified according to income or economic status.

## I. THE APPLICABLE LEGAL STANDARD

Before ordering an evidentiary hearing, the court considered the statute and, in a prior opinion, set forth its interpretation of the congressional mandate and the method that might best be used to determine the adequacy of representation of any group. What was said there need not be repeated here.

But what was implicit in that opinion should be unequivocally stated here: it is irrelevant in a Jury Act challenge that the plan has been prepared and implemented in good faith, or that the discrimination, if any, is unintentional. Cf. Glasser v. United States, 1942, 315 U.S. 60, 86, 62 S.Ct. 457, 86 L.Ed. 680. Nor need the defendant show prejudice; the only question is whether the Act has been complied with. See H.R.No.1076 (90th Cong., 2d Sess.) pp. 15–16, 1968 U.S.Code Cong. & Admin.News, p. 1804; cf. Thiel v. Southern Pacific Co., 1946, 328 U.S. 217, 225, 66 S.Ct. 984, 90 L.Ed. 1181.

As this court has already observed, "Whether or not [members of the underrepresented cognizable group] who have not registered, for whatever reason, or indeed without reason, are 'at fault' for failing to exercise their franchise is immaterial; the right protected by the statute and called into question

here is the right of the defendant to be tried by a fairly constituted jury." Preliminary Opinion at pp. 9–10.

## II. REPRESENTATION OF BLACK PERSONS

The grand jury that indicted the defendant was selected in 1970 from a list of names selected at random from voter registration lists then available. However there appears to be no available analysis of these 1970 lists with respect to the registrants' race. Such data has been compiled for voters lists in 1968 and in 1972. The number of registered voters of each race in 1970 can be reasonably approximated by interpolation between the 1968 and 1972 figures. The 1970 census provides an accurate basis for the determination both of the total population and its racial composition for comparison with the voters' data.

The following chart shows the data with respect to this judicial district for the years indicated:

| | 1968 | 1972 | 1970 Interpolation |
|---|---|---|---|
| Total Voting Age Population (VAP) | 877,834 | 802,541 | 840,188 |
| Black VAP | 237,565 | 205,991 | 221,778 |
| Non black VAP | 640,269 | 600,817 | 620,543 |
| Percentage black of total registration | 19.46% | 21.43% | 20.45% |
| Percentage of registration of black VAP | 51.93% | 62.74% | 57.34% |
| Percentage of registration of non-black VAP | 74.20% | 79.44% | 76.82% |
| Percentage non-black registration exceeds black registration | 22.27% | 16.70% | 19.48% |

If it is assumed that one-half of the names on the 1970 jury list were obtained from 1968 lists and one-half from the 1973 lists, the 1970 differential would be 20.88%. In other words, had black persons registered to vote in the same ratio as white persons, there would have been 16.7% more black persons registered in 1972. Or, to put it yet another way, in 1970 blacks were underrepresented on the voter's lists, as compared to their proportion of the voting age population, by 16.7% as compared to whites.

The ultimate question, then, is whether an underrepresentation of black persons amounting to 19.48% in 1970 was a reprobated "substantial percentage deviation" or one of the permissible "minor deviations from a fully accurate cross section." See H.R.No.1076, supra, U.S.Code Cong. & Admin.News 1968, at p. 1794. The committee report does not attempt to explain these terms further: it leaves the definition of "substantial" "to the process of judicial decision."

■ Resort to dictionaries or to legal decisions that have interpreted the word "substantial" in other contexts would be vain. Had there been a tape by which to measure, Congress would have supplied it. Instead, judges are left to apply the legislative concept not by weight or measure but with good judgment guided by an effort to achieve the statutory goals.

Congress admonished that, under the statute, "the jury is designed not only to understand the case, but also to

reflect the community's sense of justice in deciding it. As long as there are significant departures from the cross sectional goal, biased juries are the result—biased in the sense that they reflect a slanted view of the community they are supposed to represent." H.R.No.1076, supra, U.S.Code Cong. & Admin.News 1968, at p. 1797.

A deviation of approximately 20% cannot be considered negligible. In 1968, black registration was 19.46% of total registration. Had black persons registered in accordance with their numerical strength in the community, 27.06% of the registration would have been black. So, in 1968, if 100 jurors' names had been selected from a list that was a cross section of the community, there would likely have been 27 black persons among the group selected; whereas if 100 names had been selected from voters' lists only 19 (or 20) would likely be black. By the same process, but interpolating between 1968 and 1972 figures, in 1970, when this grand jury was selected, a cross section of 100 names would have included 26 or 27 names of black persons whereas the voters list would likely have produced only 19 or 20 names of black persons.

The grand jury comprises 23 persons. 18 U.S.C. § 3321. Not less than 16 constitute a quorum. Ibid. The concurrence of 12 or more grand jurors is required for indictment. Rule 6(f) F.R. Cr.P.

Chance might produce a particular grand jury that was entirely white, or entirely black, entirely male or entirely female, or in some other respect not a microcosm of the community. But if a particular grand jury were completely characteristic of the community, 27% of its members would be black—6 grand jurors. If chance produced a grand jury whose members constituted a cross section of the registration list, it would include 20% black persons—5 black persons. Statistical probability then suggests that the likely impact of the deviation on this particular grand jury was that it included one less black person than the ideal.

In fact the venire from which the grand jury that returned these indictments was selected included 50 persons: 16 of these were known black, 32 known white and 2 whose race is unknown. The 23 persons that actually composed the grand jury included 6 persons known to be black, 16 known to be white, and one person whose race is unknown to the jury commissioner.

The list of names from which the petit jury that will try the defendants will be selected, if the indictment is not dismissed, is nearer to the goal than the list from which the grand jury was selected. This is a result of the fact that, since 1970, black persons have been registering in increasing numbers in this district. Hence the list now reflects an underrepresentation of black persons of 16.70%.

## III. WHAT IS "SUBSTANTIAL"?

The task is to decide in some reasoned fashion whether the deviations discussed are "substantial." This should not be determined by visceral reaction or ad hoc hypothesis, for judges are expected to give logical reasons for their decisions. The judge's explicit formulation of his ratio decidendi for himself, and his formal disclosure of it to others, are attempts both to assure deliberation and to aid in the evaluation of his opinion.

One of the rabbis quoted in the Gemara, a post-Biblical Hebrew religious commentary, aphoristically remarks, "If it were not permitted to judge him, how could he judge?" "Thus the law insists not only that a judge have time for deliberation but also that he indicate the actual exploitation of his opportunity." Cahn, The Sense of Injustice, 100.

It is difficult, however, to articulate principles by which it can be determined what is "substantial" in a deviation from the ideal cross section. By the very nature of the tests adopted by Congress, there can be no absolute meas-

ure of what is substantial; the term must be defined in its relationship to the situation in a particular federal judicial district, considering the size of each racial group, the trends in voting, the actual results in jury selection, the overall impact of the selection process, and any other relevant evidence.

Considering these factors in the Eastern District of Louisiana, it would be easy to conclude that a deviation of 10% was minor, or to decide with equal facility, that a 30% deviation is substantial. The present case strikes me as one where the weights are about evenly balanced.

 The Jury Plan now in operation has been approved by all of the judges of this court and by the Fifth Circuit Court of Appeals. These judges did not of course have before them the data now presented to me, but the fact of their approval indicates that I should feel some sense of conviction that the plan is improper before setting it aside. In determining whether the defendants' claim carries such conviction, several factors tilt the scale as I weigh the evidence.

 The burden of showing a deviation is on the defendants. They must show substantial failure to comply with the statute, 28 U.S.C. § 1867(a). As has already been indicated, it is not a prerequisite for those who challenge a plan's compliance with the statute to show prejudice. But in evaluating whether an underrepresentation is substantial, it is appropriate to examine whether the underrepresentation in theory has produced discrimination in fact. Here, the jury plan, in actual operation, did not result in underrepresentation on the grand jury, and the statistical probability of underrepresen-

tation of black persons will be less with respect to the venire from which the petit jury will be formed. The impact of the underrepresentation on the actual composition of the petit jury will probably not be sufficient to result in a substantial actual underrepresentation.

Hence I conclude that the defendants have failed to show that the deviation with respect to black persons is substantial in the sense that the statute requires.

## IV. FOOD STAMP RECIPIENTS—
### Definition of the problem

By an examination of the lists of recipients of food stamps in this judicial district, careful and intelligent use of computer analysis, and time consuming field checks of voter lists, the defendants have demonstrated that only 30.-03% of the persons living in this district who receive food stamp assistance and who are over the age of 21 are registered to vote, while 77.76% of the remainder of the population over 21 are registered. Hence, food stamp recipients, as a group, are 47.73% underrepresented on the voters registration lists.

While food stamp recipients include poorer members of our society, they are not the poorest. Many who are eligible to receive food stamps are not eligible to receive other public financial assistance, such as Old Age Assistance, Aid to Dependent Children, Aid to the Permanently and Totally Disabled and Aid to the Needy Blind.[1] Those who receive food stamps but not public financial assistance are sometimes called "Non-Public Assistance" or "NPA Food Stamp" recipients. In general, households are eligible for food stamps even though they have higher incomes than those who receive public financial assistance.[2]

---

1. 42 U.S.C. § 301 et seq., 42 U.S.C. § 601 et seq., 42 U.S.C. § 1351 et seq., and 42 U.S. C. § 1201 et seq., respectively.

2. As of January 1, 1974, Old Age Assistance (OAA), Aid to the Needy Blind (ANB) and Aid to the Permanently and Totally Disabled (APTD) will come under the single Supplemental Security Income (SSI) program to be

administered by the Social Security Administration. Until that time, the Louisiana State Department of Public Welfare will continue to run these programs. The Aid to Families with Dependent Children (AFDC or ADC) program is now run and will continue to be administered by the Welfare Department of Louisiana. There is no maximum income, as such, that may be earned by individuals

Eligibility for food stamps is limited to those "households whose income and other financial resources are determined to be substantial limiting factors in permitting them to purchase a nutritionally adequate diet." 7 U.S.C. § 2014. The regulations, 7 CFR 271.1 et seq., currently establish this based on both household size and household income, so there is no flat income figure under which all families are eligible. For a household with two persons, $2,796 is the maximum annual income for food stamp eligibility. For a household of three persons, the maximum is $3,684. For a household of four persons, it is $4,476. There is an additional increase in permitted income for each additional person in the household.

The defendants' examination extended only to food stamp recipients. A group

composed of food stamp recipients is a different group from P A recipients; it includes all or almost all who receive public assistance and it also includes other persons who have greater incomes. However, there is no reason to doubt, and some reason to believe,[3] that the poorest persons register in no greater numbers than the group of food stamp recipients. Hence it is evident that persons in both of these groups are substantially underrepresented on the voter registration lists, and are likely to be similarly underrepresented on any list drawn at random from those voter lists.

Nor does it justify this result that an unusually large proportion of food stamp recipients might be ineligible to serve on juries because of illiteracy, or subject to excuse, for such reasons as

who are recipients of these funds. Each program has a certain maximum aid figure that may be given to one needy individual. These amounts are:

APTD........$70/month
OAA.........$107/month
ANB.........$105/month
ADC.........$34/month

In order to be eligible for this assistance, first the individual's budgetary needs (allowable requirements) are determined, based on a standard inquiry. Secondly, applicable income (see explanation which follows) is deducted from these needs. That figure which remains is paid under the applicable program up to the maximum allowance.

Under ADC, a family of two (a mother and her dependent child) who have a yearly income of $2040 would, after the allowable deductions granted by the State regulations are made against that income, be considered to have a $67 per month "income." The maximum assistance grant presently available in Louisiana for this family is $64 per month. To the extent their needs exceed their $67 monthly "income," they could receive aid up to this $64 figure. Thus their needs would have to be $131 here ($67 "income" + $64 assistance). Similarly, a mother and two children earning $2520 per year has an "income" after deductions of $90 per month. The maximum aid they may obtain, assuming their needs require it, is $90. Again, their needs must be at least $180 monthly ($90 "income" + $90 assistance) in order to receive the maximum assistance.

In the APTD program, a single individual with a yearly income of $1800 has, after applicable deductions, a $72 monthly "income." Since the maximum grant is $70 per month, his needs must exceed $142 per month to receive the full grant. Two individuals whose income is $2000 per year must have needs of $178 monthly in order to take advantage of the total grant of $89 per month.

The OAA and ANB programs have set up a maximum income figure that may be earned, $5000 gross annual income. Once this income level is reached, no aid may be obtained, regardless of need. This figure applies whether there is one needy person, or that person and his spouse.

Under the Supplemental Security Income program, the states will no longer administer the various assistance grants, with the exception of ADC. Although the Social Security Administration has prescribed new regulations and standards, the net effect will be to maintain assistance at the levels established by the states.

See Louisiana Health, Social and Rehabilitation Services Administration, Division of Income Maintenance Welfare Manual 2–750 through –1027 and Executive Bulletin No. 820, July 2, 1973. See generally Dandridge v. Williams, 1970, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, and Rosado v. Wyman, 1970, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442.

3. See Babbie, Survey Research Methods, p. 90 (1973) (". . . poor people are less likely to vote.").

illness and old age; the initial list from which jurors are chosen must constitute a representative cross section of the community even though the operation of the plan may eventually result in a jury venire that is not typical. H.R.No. 1076, supra, U.S.Code Cong. & Admin. News 1968, at p. 1794.

The Census Bureau has analyzed data collected in the 1970 census with respect to income. Its Report on Family Income is based on annual income alone, without regard to the number of persons in a household. Its data reflect the following relationships between income and registration:

Rate of Registration of Persons in Primary Families
by Family Income for the United States

| Family Income | All Persons | Reported Registered | Rate of Registration |
|---|---|---|---|
| Under $3,000 | 8,931 | 5,466 | 61.2% |
| $3,000 to $4,999 | 13,149 | 8,434 | 64.1% |
| $5,000 to $7,499 | 17,547 | 11,526 | 65.7% |
| $7,500 to $9,999 | 17,379 | 12,326 | 70.9% |
| $10,000 to $14,999 | 30,270 | 23,534 | 77.7% |
| $15,000 and over | 23,126 | 19,664 | 85.0% |

This data is taken from the first three columns of the first block of information in Table 11 on page 93 of the Bureau of Census Report and the first three columns of the fourth block of information in Table 11 on page 96. The numbers are expressed in thousands.

The income groups described in the census data, food stamp recipients and persons who receive public assistance, are all identifiable. Since each has distinct and somewhat different characteristics, the groups are not comparable by statistical criteria. But it appears that members of each group register to vote in substantially lower numbers than other members of society. We must consider whether this underrepresentation requires the Plan to be overturned.

## V. COGNIZABILITY OF THE GROUP

### A. Identification of the Poor as a Cognizable Group

"It is well established," the Court of Appeals for the Ninth Circuit said in United States v. Ross, 9 Cir. 1972, 468 F.2d 1213, 1217, "that jury pools are not required to be a mirror image of the community. Swain v. Alabama, 1964,

380 U.S. 202, 208, 85 S.Ct. 824, 13 L. Ed.2d 759. To establish a violation of section 1861, it is necessary to show the systematic exclusion of *an identifiable group* within the community. United States v. James, 9 Cir. 1971, 453 F.2d 27, 29." (Emphasis supplied). Preliminary Opinion p. 4. Other courts have used the term "cognizable group" to identify a class of persons who have the quality requisite to permit them to challenge a jury plan. See United States v. Pentado, 5 Cir. 1972, 463 F.2d 355, cert. denied, 410 U.S. 909, 93 S.Ct. 963, 35 L. Ed.2d 271; United States v. Zirpolo, 3 Cir. 1971, 450 F.2d 424; United States v. Kuhn, 5 Cir. 1971, 441 F.2d 179; United States v. Guzman, S.D.N.Y.1972, 337 F.Supp. 140; United States v. Deardorff, S.D.N.Y.1971, 343 F.Supp. 1033.

These terms are used to indicate that there are identifiable groups, people whose underrepresentation on the list of voters, for whatever reason, does not give them standing to attack a jury plan. This might be a group of people whose common characteristics are such that their inadequate inclusion does not frustrate the purposes of the Act (e. g. those who wear eyeglasses challenge a

plan for its alleged failure to include a representative cross section of people with abnormal vision) or whose common characteristics are so difficult to establish with certainty and change so frequently that it is impracticable to identify them from time to time (e. g. persons who have television sets) or whose insufficient inclusion might be justified on some other basis.

The problem has been discussed in considering challenges to jury plans for failure to include representative groups of persons between certain ages. Thus, in United States v. Ross, supra, the jury wheel was challenged for failure to include a representative number of persons between the ages of 21 and 24. The court said,

> "Both before and since passage of the Act, courts have been requested to recognize 'young people' as a distinct group for purposes of determining whether a jury panel includes a fair cross-section of the community. With one exception, which is distinguishable, they have refused to do so. This reluctance is justified in the light of the fact that the parameters of such a group are difficult to ascertain, as evidenced by the widely varying ages which have been used to define it, and that its membership and their values are constantly in flux. There appears to be no factor other than age which defines this group, and we can perceive no reason to arbitrarily single out a narrow group of 'young persons' as opposed to 'middle-aged' or 'old' persons for purposes of jury service." 468 F.2d at 1217.

See, in accord, United States v. Kuhn, supra 441 F.2d at 181. Compare United States v. Dellinger, 7 Cir. 1972, 472 F.2d 340, at 368, holding that persons who do not register to vote are not a cognizable group on the basis that they are "politically alienated." See also United States v. Gooding, 5 Cir. 1973, 473 F.2d 425, dealing with persons who

became eligible for jury service by attaining voting age within the last three years and four months and . . . those Cuban immigrants who have become eligible "for jury service by becoming citizens within the last three years and four months . . .." *Id.* at 430.

In *Ross*, supra, the court found it significant that section 1862 of the Act, which prohibits excluding a citizen from jury service based on certain factors, does not mention youth or age. It does forbid exclusion of persons from jury duty because of their "race, color, religion, sex, national origin, *or* economic status." United States v. Blair, 5 Cir. 1972, 470 F.2d 331; United States v. Pentado, supra.

 Unlike race, religion, sex or national origin, which are determinable binarially,[4] economic status is entirely a matter of degree. There can be little doubt that a married couple with an annual income of $2,850 and no savings would consider themselves "poor." But they are not eligible for food stamps. The division of the entire population into "poor" and "not poor" persons creates an illusion of a real dividing line where none exists in fact. For there is no national standard of who is poor and who is not poor. The classification of persons by a specific dollar income, resulting in a household of one income being in one classification, and another —with only $1.00 more annual income— being in another serves a useful function to determine who may be eligible for a public benefit, but it is entirely arbitrary if used as the sole criterion of economic status or of poverty, for jury purposes.

If the motion be treated as relating only to persons eligible to receive food stamps as defined in 7 U.S.C. § 2011, then it would state objective criteria. See Preliminary Opinion at p. 8. But while this would create a sharp line of demarcation, albeit an arbitrary one, the

---

4. E. g. a person is or is not a Roman Catholic, a Methodist, or a Jehovah's Witness. He is, or is not, black, or white, or Oriental. He is, or is not, descended from Polish immigrants.

separation of the population in this way with respect to its presumed qualities or outlook with respect to jury service would be entirely artificial.

Our population has an almost infinite number of gradations in income and net worth. The Census Bureau Report, as set forth above, divides households into 5 classifications of income below $15,000 and one of households with $15,000 annual income or more. There is no reason to believe, however, that households with an income of $15,000 to $20,000 annually—a group that would include many civil service workers, and some skilled and semi-skilled tradesmen—is comparable in its social and economic outlook, or whatever other qualities are sought in jurors, to those whose annual incomes exceed $100,000 a year. Other demographic studies separate the population into quintiles for statistical purposes, treating alike the 20% of the population with the lowest income, the next 20%, and so forth, up to the highest 20%. See, e. g., U. S. Bureau of Census, Historical Statistics of the United States, Colonial Times to 1957 (Wash., D.C., 1960); see letter from Professor John K. Wildgen to Mr. James J. O'Connor, Assistant United States Attorney, November 14, 1973, Analysis of 1964, 1968 and 1972 Election Studies conducted by Survey Research Center (SRC), University of Michigan.

None of these divisions, however, permit a separation of "poor" persons from persons who are not poor or a ready identification of the poor and those who are not poor. Even were it possible to separate the populace into these two groups in some objective fashion, the status of a particular person might well change from one year to the next. While this is true of any classification based on economic status, the elusiveness of the concept and the changes in purchasing power of money make the use of such a classification difficult.

It is unnecessary to determine whether the requirement of a representative cross section in section 1861 is modified by section 1862 so that the jury must also contain a cross section with respect to the factors mentioned in section 1862. It is sufficient to undertake to decide whether it must contain a community model with respect to economic status.

If we posit, as do the defendants, that the list from which jurors are selected must be a paradigm of the community with respect to economic status, the list would be required to be emblematic not only with respect to those who are poor and those who are not poor, but with respect to all of the economic groups in the community, the poorest, the lower middle class, the middle class, and the rich.

Section 1863 describes supplementation "where necessary to foster the policy and protect the rights secured by sections 1861 and 1862." But the Committee report's references to economic status are in terms of the nature of the work done by the prospective juror, such as whether they are craftsmen or laborers; it intimates no requirement that the voter list be a paradigm of the community's economic structure. H.R. No.1076, supra, U.S.Code Cong. & Admin.News 1968, at p. 1794 n.1.

 It would clearly be invalid for a jury plan to exclude persons of a particular national origin, such as descendents of immigrants from Ireland, or those of a particular religion, such as Jews. It does not necessarily follow that a jury plan is invalid under section 1861 if, upon examination of the voter lists, it is discovered that 10% of the adult population is of Irish descent, or that 6% of the population is Jewish, but that, because of failure to register to vote, each group is underrepresented by 30% on the voting list.

Nor is the problem very different, indeed, if it is discovered that descendents of the Irish or persons of the Jewish faith register to vote in a federal judicial district in disproportionately large numbers and therefore are overrepresented by 40%. Overrepresentation of either group would necessarily result in underrepresentation of others: non Irish and non Jews.

The defendants' position would require the statute to be interpreted to require the initial list of names used to select jurors to constitute a cross section of the community in terms of economic status. Something of the complexity of the problem created if the statute is thus construed and if we consider any particular group of voters as constituting a cognizable group based on their income is illustrated by the data compiled by the University of Michigan's Survey Research Center with respect to voting patterns in the last four presidential elections classified according to income category by quintile:

| Election Year | Lowest ⅕ | 2nd ⅕ | 3rd ⅕ | 4th ⅕ | Highest ⅕ | |
|---|---|---|---|---|---|---|
| 1964 % registered | 75% (280) | 78% (276) | 84% (389) | 90% (237) | 91% (309) | N=1491 |
| 1968 % registered | 74% (348) | 81% (334) | 87% (258) | 87% (248) | 92% (312) | N=1500 |
| 1972 % registered | 70% (248) | 73% (277) | 78% (267) | 86% (222) | 92% (273) | N=1287 |

The income grouping used was:

| Code | Category | % Respondents |
|---|---|---|
| Lowest | Less than $3000 | 19% |
| 2nd ⅕ | $3000 – $4999 | 19 |
| 3rd ⅕ | $5000 – $7499 | 26 |
| 4th ⅕ | $7500 – $9999 | 16 |
| 5th ⅕ | $10,000 + | 21 |
| Total | | 101% |

Thus, in 1972, the underrepresentation of persons in the second income quintile was almost as great as of those in the lowest quintile. Enriching the jury list with the names of additional food stamp or welfare recipients (from the lowest quintile) would not eliminate the nonrepresentative character of the list. For then persons in lower middle income groups (the second and third quintiles) would be underrepresented as compared to those in higher and lower income brackets. Such underrepresentation would be cause for complaint not only by defendants who are themselves in a middle income bracket but by all defendants for, if the source of the jury list is not representative, any defendant may challenge it whether or not he is a member of the group underrepresented. H.R.No.1076, supra; Peters v. Kiff, 1972, 407 U.S. 493, 92 S. Ct. 2163, 33 L.Ed.2d 83; Thiel v. Southern Pac. Co., supra; United States v. Guzman, supra.

This district's jury plan does not exclude anyone. Hence section 1862 is not violated. No local prejudice, historical or otherwise, results in underrepresentation of poorer persons. If this be a vice in selection methods, it is ultimately insoluble in any practical sense, save by statistical sampling of the populace. And this remedy would be necessary not only in this district, but in every judicial district in the nation.

VI. COGNIZABILITY CONSIDERED IN TERMS OF THE UNDER-REPRESENTED GROUP'S CHARACTERISTICS AS A LOCAL OR NATIONAL PHENOMENON

Congress assumed that either a voter registration list or a list of actual voters would be an acceptable basis

for selection of a jury nationwide. 28 U.S.C. § 1863. See H.R.No.1076, supra, U.S.Code Cong. & Admin.News, 1968, at pp. 1792, 1794, 1795. The jury selection plan "shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." 28 U.S.C. § 1863(b)(2). The term "where necessary" implies that, while in some geographic areas it may be necessary to supplement voter lists,[5] this is viewed as an aberration rather than a typical case. See United States v. Deardorff, supra, 343 F.Supp. at 1041, where the court observed:

"Had Congress felt that voter lists were inadequate to produce a cross section anywhere in the United States, it would not have selected them as the primary source for jury lists."

If it be assumed that either the poorest persons in the population or food stamp recipients are a cognizable class, the fact that this group is not adequately represented in the voter list has been demonstrated. But it has likewise been demonstrated that this skew occurs nationwide. Thus, the data presented from the University of Michigan SRC Study, supra, as reanalyzed by defense counsel, demonstrates:

Rate of Registration for the Poor and Non-Poor for Persons in
Primary Families in the United States Using a Hypothetical
Poverty Dividing Line of $3,000

| Family Income | All Persons | Reported Registered | Rate of Registration |
|---|---|---|---|
| Poor (Under $3,000) | 8,931 | 5,466 | 61.2% |
| Non-Poor ($3,000 and over) | 101,471 | 75,484 | 74.4% |
| Difference 13.2% | | | |

Rate of Registration for the Poor and Non-Poor for Persons in
Primary Families in the United States Using a Hypothetical
Poverty Dividing Line of $5,000

| Family Income | All Persons | Reported Registered | Rate of Registration |
|---|---|---|---|
| Poor (Under $5,000) | 22,080 | 13,900 | 63.0% |
| Non-Poor ($5,000 and over) | 88,322 | 67,050 | 75.9% |
| Difference 12.9% | | | |

The data shows that nationally there is a percentage deviation in registration rates of approximately 13% between "poor" families and "non-poor" families, regardless of whether the dividing line is $3,000 annual family income or $5,000

annual family income, or presumably anything in between. Reduced to proportional terms, this is $13/75$, or 17%.[6]

If the available data gathered by the SRC study are divided into South and

5. While the report states the requirement to list "whenever" the situation occurs, the statutory language should not be considered inadvertent. H.R. No. 1076, supra, U.S.Code Cong. & Admin.News 1968, at p. 1794.

6. The University of Michigan SRC study finds a greater deviation between registration of lower and higher income groups than the Census Report.

non-South categories, the underrepresentation is demonstrated to be greater in the South than in other parts of the nation:

### Registration and Income in the Non-South and South 1964–1972

#### Income Category by Quintile (Non-South)

| Election Year | Lowest | 2nd | 3rd | 4th | Highest | |
|---|---|---|---|---|---|---|
| 1964 % registered | 82% | 81% | 84% | 90% | 93% | |
| | (165) | (172) | (272) | (196) | (227) | N = 1032 |
| 1968 % registered | 77% | 85% | 89% | 89% | 94% | |
| | (220) | (217) | (193) | (177) | (239) | N = 1046 |
| 1972 % registered | 74% | 72% | 81% | 86% | 92% | |
| | (130) | (176) | (182) | (158) | (210) | N = 856 |

#### Income Category by Quintile (South)

| Election Year | Lowest | 2nd | 3rd | 4th | Highest | |
|---|---|---|---|---|---|---|
| 1964 % registered | 65% | 73% | 85% | 88% | 85% | |
| | (115) | (104) | (117) | (41) | (82) | N = 459 |
| 1968 % registered | 70% | 73% | 82% | 80% | 86% | |
| | (128) | (117) | (65) | (71) | (73) | N = 454 |
| 1972 % registered | 65% | 76% | 69% | 84% | 91% | |
| | (118) | (101) | (85) | (64) | (63) | N = 431 [7] |

The warp in registration has been demonstrated to be greater in the Eastern District of Louisiana than elsewhere in the nation. It is a matter of logical deduction that, in some areas, the extent of underrepresentation of food stamp recipients compared to non-recipients, is not substantial, in the sense that term is defined in the first part of this opinion. But all the data demonstrate that everywhere in the South and everywhere in the nation the poorest people register in substantially lower proportion than the richest.

It is clear that Congress contemplated that in particular localities it might be necessary to supplement lists in one regard or another. It is not clear that Congress did—or indeed did not—have any intention with respect to the situation that would be presented if it were discovered that voter lists are inadequate in every judicial district in the nation.

Precedent and philosophy command courts to seek legislative intention in interpreting a statute. But it is pointless to inquire what Congress intended on this matter, for it is evident that the issue never occurred to the legislators who adopted the statute. As John Chipman Gray said in Nature and

---

7. Louisiana has a greater percent of families with incomes under $3,000 than all but 3 states. In 1969, 18.9% of its families had that little income while nationally only 10.3% of the family group were equally poor. Thus Louisiana had almost twice as many family units in this low income category as the national average. Public Affairs Research Council, Statistical Profile of Louisiana, p. 8.

The Census Bureau's poverty level figure (as has been indicated above) was $3388 per family. Based on this criteria, 21.5% of Louisiana families were below the poverty level, compared to 10.7% nationally. Here again Louisiana ranked 48th. PAR Statistical Profile of Louisiana at page 8.

Of all black families in the state, 47.4% (105,958 families), and of all white families, 12.6% (81,481 families), earn so little as to be within the poverty level group. Thus Louisiana is not only one of the states with the highest proportion of poor persons, but the greater percent and the greater number of poor families are black. These data confirm the defendants' contention that underrepresentation of black persons and of poor persons is to some degree overlapping.

Sources of the Law: Statutes. (1921 ed. p. 173), "The difficulties of so-called interpretation arise when the Legislature has had no meaning at all; when the question which is raised on the statute never occurred to it; when what the judges have to do is, not to determine what the Legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present."

The inquiry necessarily must be what solution will best implement the policy of the law. United States v. Sisson, 1970, 399 U.S. 267, 297–298, 90 S.Ct. 2117, 2132–2133, 26 L.Ed.2d 608; Cawley v. United States, 2 Cir. 1959, 272 F. 2d 443 (L. Hand, J.). The important general principles embodied in the Jury Selection and Service Act of 1968 were, "(1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness." H. R.No.1076, supra, U.S.Code Cong. & Admin.News 1968, at p. 1793.

To these ends,
"the bill specifies that voter lists be used as the basic source of juror names. These lists provide the widest community cross section of any list readily available. Census data quickly become out of date and are not suitable. The bill requires that the voter lists be supplemented by other sources whenever they do not adequately reflect a cross section of the community. The bill, as amended, provides that sources of names other than voter lists may be used to *supplement*, but not *supplant*, voter lists." H.R.No. 1076, supra, U.S.Code Cong. & Admin.News 1968, at p. 1794. (Emphasis in original).

It is difficult to conclude that adding the names of more food stamp recipients to the list of registered voters would make that list prefigurative of the community; or that, had Congress been provided with the data furnished to this court, it would have separated the populace into the poor and the not poor, and required voter lists to be supplemented either nationally, or in this particular district, with the names of more poor persons.

 It is not the burden of defendants to prove that underrepresentation is due only to local factors. The defendants must show only that the group whose underrepresentation they protest is cognizable and that the extent of underrepresentation is substantial. But I must conclude, for the reasons set forth above, that neither the poor nor food stamp recipients are a cognizable group within the meaning of the Act.

For these reasons, the motion to dismiss will be denied.