**UNITED STATES of America**

v.

**Raul Efrain GAONA.**

**Crim. No. SA–76–CR–202.**

United States District Court,
W. D. Texas,
San Antonio Division.

Feb. 14, 1978.

Jamie C. Boyd, U.S. Atty., San Antonio, Tex., for the Government.

Walter J. Bonner, Washington, D.C., Ruben Sandoval, San Antonio, Tex., David Kairys, Philadelphia, Pa., for defendant.

## MEMORANDUM RULING

EDWIN F. HUNTER, Jr., Senior District Judge: *

On January 12, 1978, Dr. Gaona, through counsel, requested a hearing pursuant to 28 U.S.C. § 1867 concerning his motion challenging the jury selection system in the San Antonio Division of the Western District of Texas. The request was granted. An evidentiary hearing was held on January 23, 1978. The motion is predicated on the alle-

* Edwin F. Hunter, Jr., U.S. District Senior Judge, W.D.La., sitting by designation.

gations that jurors selected under the plan are not drawn from "a fair cross section of the community" as required under the Jury Selection and Service Act of 1968. 28 U.S.C. § 1861, et seq., as amended.

The Act allows for flexibility by relegating the task of formulating plans to the judicial district-division level. Under § 1863, each district or division is required to adopt a formal written plan, to be scrutinized by a reviewing panel comprised of the appropriate judicial council and either the Chief Judge of the appropriate district or some other active judge designated by the Chief Judge. The plan under attack here has been so reviewed and approved. As required by section 1863(b)(2) of the Act, the San Antonio plan utilizes voter registration lists as the initial source of names for potential jurors. Names are selected from these lists at fixed intervals and placed into a master jury wheel from which a qualified jury wheel is in turn selected at random. Defendant concedes this selection process is mathematically random and that the demographic composition of the master jury wheel accurately reflects the composition of the voter registration lists.

The major thrust of defendant's challenge is that there exists a substantial disparity between the representation of a cognizable class (Mexican-Americans) in the population and the voter registration lists. This disparity, it is contended, requires that "some other source or sources of names in addition to voter lists" be utilized. 28 U.S.C. § 1863(b)(2). (See *Jury Representativeness*, pp. 816–26, by David Kairys, et al., reprinted from California Law Review, Vol. 65, No. 4, July 1977).

We are aware of no case in which exclusive reliance on voter registration lists has

been invalidated. Nevertheless, Congress saw fit to enunciate a duty to supplement the source lists where necessary to protect the rights secured by § 1861 and § 1862. Senate Report No. 891, 90th Congress (1967), notes:

> The voting list need not perfectly mirror the percentage structure of the community. But any substantial deviations must be corrected by use of supplemental sources. Your committee would leave the definition of substantial to the process of judicial decision.

The sole, additional guidance is furnished by the observation that the disparity must be "great" or "pronounced," [1] and the suggestion that substantiality be tested by the ease or difficulty by which the disparity may be eliminated.[2]

## THE CONSTITUTIONAL CLAIM

What is guaranteed by the Sixth Amendment and Due Process clauses of the Fifth Amendment are juries selected from source lists, and by procedures which are free from discrimination. It follows that a successful constitutional challenge to a jury plan requires evidence that a cognizable group has been purposely and systematically excluded. The precise meaning of "purposely and systematically excluded" has been the subject of considerable controversy. The necessary exclusion may be established without proof of specific intent. There are two ways that defendant could sustain his constitutional challenge of this voter registration jury plan.[3] First, by proving that there are affirmative barriers to voter registration by Mexican-Americans. Second, if, during the process of qualifying jurors drawn from the registra-

---

1. 114 Cong.Rec. 1348 (remarks of Congressman Kastenmeir.)

2. Gewin, *The Jury Selection and Service Act of 1968*, 2 Mercer L.R. 349, 383 (1969). See 506 F.2d 813, 816, *An Analysis of Jury Selection Decisions*, Gewin (1975).

3. This plan was adopted by the W.D. of Texas, and approved by the Judicial Council for the Fifth Circuit Court of Appeals, as required by 28 U.S.C. § 1863(a). Although it is not a part of this record, it is an official public record on file with this Court and a proper subject for judicial notice. Fed.R.Evid., 201(b) and (f).

tion lists, there is a "progressive decimation or dilution" of the proportion of Mexican-Americans available for jury service. There is no evidence of affirmative barriers. The limited evidence as to dilution just does not suffice.[4] Defendant has failed to make a prima facie showing that the Jury Selection Plan of this division violates the guarantees of the Fifth and Sixth Amendments.

■ Mexican-Americans, as such, are a cognizable group, but neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group registers to vote in a proportion lower than the rest of the population. While a fairer cross section may have been produced by the use of "other sources," the plan's sole reliance on voter registration lists was constitutionally permissible. *United States v. Evans*, 542 F.2d 805 (10th Cir., 1976); *United States v. James*, 528 F.2d 999 (5th Cir., 1976); *United States v. Lewis*, 472 F.2d 252 (3rd Cir. 1972).

## THE STATUTORY CLAIM

It is defendant's position that in enacting the Jury Selection and Service Act, Congress established statutory standards for judging the legality of jury plans which are more rigorous than the constitutional standard of "systematic exclusion." Specifically, they contend that under 28 U.S.C.A.

§ 1863(b)(2), "voter registration lists or the lists of actual voters" are to be the primary source, and that each district "shall prescribe some other source or sources of names * * * where necessary to foster the policy [of representation of a cross section of the community]." Further, they argue that a "statistically significant underrepresentation" of cognizable groups constitutes a "substantial failure to comply" with the "fair cross section" requirement, *irrespective of the cause* of such under-representation.[5]

The language of this provision appears to mandate supplementation where there is a substantial statistical disparity, but only two districts supplement voter lists. No court has required multiple lists or supplemented a primary list on constitutional or statutory grounds.[6] The failure to implement is not because of a lack of challenges.[7]

The Supreme Court has not directly considered the issue, but the majority of lower federal courts have responded to the congressional mandate by construing the statutory "fair cross section" standard as the functional equivalent of the constitutional "reasonably representative" standard. *United States v. Test*, D.C.1975, 399 F.Supp. 683, 691, and cases cited therein. It is highly pertinent that under-representation of Mexican-Americans in the instant case has no proven cause other than failure to register to vote in the same proportions as

**4.** We appreciate the undisputed fact that registration procedures and elections which are conducted only in English have tended to exclude Chicanos from the electoral process. But there is no constitutional barrier to 28 U.S.C. § 1865(b)(2) which disqualifies any prospective juror who "is unable to read, write and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the jury qualification form." *United States v. Tijerina*, 446 F.2d 675 (10th Cir. 1971).

**5.** In making this argument, defendants rely, in part, on the following language from the Government's brief in *United States v. Test*, 399 F.Supp. 683:

We believe * * * that the Act created broader rights than those established under

Sixth Amendment principles, and, specifically, that substantial under-representation of a cognizable group (such as blacks or Mexican-Americans) would necessitate resort to supplementary sources under Section 1863 (if it has a substantial impact on selection of jurors * * * even though no history of voter discrimination against the group is proved).

**6.** See cases cited in footnotes 12–17 and 202, California L.R. Vol. 65, No. 4, July, 1977, Kairys.

**7.** One court has invalidated use of voter registration lists as the sole source, but that decision was quickly reversed by an appellate court. *People v. Taylor* (Cal.Ct. of App., 2nd Dist., Nov., 1974, No. 45230).

Blacks and Anglos. The law in the Fifth Circuit is:

"A group of persons who choose not to register do not constitute a cognizable group." *Camp v. United States*, 413 F.2d 419 (5th Cir., 1969); *Grimes v. United States*, 391 F.2d 709 (5th Cir., 1968); *United States v. Dangler*, 422 F.2d 344 (5th Cir., 1970); *United States v. James*, 528 F.2d 999 (5th Cir., 1976). See also *United States v. Lewis*, 472 F.2d 252 (3rd Cir., 1973).

Following these precedents we deny both the constitutional and statutory claims of defendant.

However, it is appropriate to review the testimony of defendant's experts. Defendant offered proof that 56.8% of the 18 years and over population in the fourteen counties comprising the San Antonio Division is Mexican-American, but that only 37.8% of the source list is Mexican-American. Defendant's expert demographers were Dr. Jose Hernandez, Professor and Head of the Department of Sociology at the University of Wisconsin, who is an advisor to the Census Bureau and whose primary work has been devoted to the demography of Spanish origin people, and Dr. Harley Browning, Professor of Sociology at the University of Texas at Austin, who was Director of the Population Research Center at the University of Texas from 1964–1977. Dr. Browning has done extensive research and writing concerning the demography of Mexican-Americans in Texas.

Dr. Hernandez prepared a report (Defendant's Exh. 3, See Appendix) is which he presented a precise analysis of how he projected the Mexican-American proportion of the population. In his report and testimony, Dr. Hernandez indicated where and on what basis estimates were made. His first task was to estimate the Spanish surname population, 18 years and older, in 1978. The 1970 U.S. Census revealed the primary racial ethnic division of the population to have been: 330,831 Spanish surname; 428,981 Anglo surname; and 59,252 Black and other non-white.[8] He then made an adjustment of 12.5% for an estimated undercount in Spanish-American names. The adjusted totals were updated to 1978, according "natural" increase factors (birth rate in each group minus death rate in each group). With these adjustments, the estimate was that the Spanish surname population had risen to 45.4%. Dr. Hernandez proceeded to convert the Spanish surname date to "Mexican-American" estimates. It was estimated that 24% of Mexican-Americans have non-Spanish surnames. On the basis of this conversion, the updated Spanish surname total of 444,922 was increased by 111,230 and resulted in a total of 56.8% percentage of the population. See Defendant's Exh. 3, See Appendix for details. If we accept these estimates we have an absolute disparity of 19%.[9]

This pronounced statistical disparity (if accepted as to relevant starting point and fact) would require this court to question seriously whether the selection process has produced the statutory "fair cross section." But, defendant's approach ignores com-

---

8. Based on the 1970 Census, there was little disparity, if any.

9. There are other alternative methods for measuring disparities. These suggested approaches have been extensively discussed by Judge Gewin, 506 F.2d 805, 811, 818, and were considered at length by Judge Arraj in *United States v. Test*, 399 F.Supp. 683 at 693 (D.C. Colo.1975). The absolute disparity standard has been used by most courts. *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Smith v. Yeager*, 465 F.2d 272 (3rd Cir. 1972); *Black v. Curb*, 464 F.2d 165 (5th Cir. 1972); *Sanford v.*

*Hutto*, 394 F.Supp. 1278 (E.D.Ark., aff'd, 523 F.2d 1383 (8th Cir. 1975). In *Swain, supra*, the Court referred to an absolute disparity of 10–16% as a minimal showing for a prima facie case, but this has never been regarded by the Court as a minimum standard or even referred to in later opinions of the Court. The *Test* court adopted and mechanically applied the outside limit referred to in *Swain*, as a necessary requirement for proof of a substantial disparity, stating that in *Swain* the Court "implicitly held that a prima facie case of systematic exclusion was not established by demonstrating a disparity of as much as 16%. 550 F.2d 577, at 587 (10th Cir. 1976).

pletely the eligibility requirements for jury service set forth at 28 U.S.C. § 1865,[10] the constitutionality of which no one attacks:

> "Common sense demands that eligible population statistics, not gross population figures, provide the relevant starting point." *Castaneda v. Partida*, 430 U.S. 482–504, 97 S.Ct. 1272, 1285, 51 L.Ed.2d 498—dissenting opinion of the Chief Justice, March 23, 1977.

The majority in *Partida* noted the concern of the Chief Justice and declined to question its premise, noting only that the majority had taken this into account in their statistical analysis. *Partida, supra,* at footnote 8, p. 489, 97 S.Ct. 1272. The proposal of the United States Commission on Civil Rights contained in *The Jury System in the Federal Courts,* West Publishing Co., 1966–1973, is of interest:

> "If analysis discloses that there is a disparity of 20% or more between the proportion of <u>eligible</u> whites selected and the proportion of <u>eligible</u> minority persons selected, then steps shall be taken to remedy this disparity." (underscoring ours)

■ We conclude that the burden of establishing a prima facie deficiency in the statutory "fair cross section" standard rests on the challenger. This burden is met when the proof reveals a substantial dispar-

ity between the percentage of Mexican-Americans eligible to serve as jurors as it relates to the eligibles in the total population. We do not know, and on this record we cannot evaluate, the degree of unrepresentativeness, if any, because there is no evidence of this nature.

Then, too, with all deference to the sincere, scholarly and able gentlemen who testified, we are not at all satisfied with the implicit assumption that an additional 111,-230 persons should be added to the Mexican-American class designation because of the estimate that approximately 25% of Mexican-Americans have Anglo names.

This Court will seek, as it has in the past, to achieve within its jury system, full representation of the community with regard to all. In so doing, efforts directed toward improvements will be made. The courts cannot, however, provide this guidance in a litigious context. The recognition that such efforts are apposite in no way requires the conclusion that intentional or negligent discrimination occurred, or that substantial lack of representation of any identifiable group existed, in connection with the juries under attack in these cases.

The defendant's challenge to the jury selection plan of this division is without merit and defendant's respective motions directed thereto are denied.

Appendix to follow.

---

**10.** § 1865. Qualifications for jury service

 * * * * * *

(b) In making such determination the chief judge of the district court or such other district court judge as the plan may provide, shall deem any person qualified to serve on grand and petit juries in the district court unless he—

 (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;

(2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

(3) is unable to speak the English language;

 * * * * * *

APPENDIX

DEFENDANT'S EXHIBIT NO. 3

BACKGROUND STATEMENT FOR TECHNICAL CONSULTATION

by José Hernández, Ph. D., January 25, 1978

Task 1: Estimate the Spanish surname population, 18 years and older, in 1978, for a total of fourteen counties in Texas (listed below).

1. For this purpose, the population 10 years and older in 1970 was used as a population base. To calculate the percent of the total population represented by Spanish Surname persons, corresponding data were prepared for the "Anglo" population (classified as white, minus Spanish surname individuals) and for black and other nonwhite persons. These three major groups make the primary racial ethnic division of the total population in the area concerned. The breakdown is as follows:

| County | A. White | B. Spanish Surname | C. Anglo (A–B) | D. Black & Other Nonwhite | E. Total (B + C + D) |
|---|---|---|---|---|---|
| Atascosa | 14,748 | 7,134 | 7,614 | 158 | 14,906 |
| Bandera | 4,141 | 364 | 3,777 | 14 | 4,155 |
| Bexar | 609,125 | 278,180 | 330,945 | 52,395 | 661,520 |
| Comal | 19,698 | 5,348 | 14,350 | 406 | 20,104 |
| Dimmit | 6,823 | 5,524 | 1,299 | 75 | 6,898 |
| Frio | 8,402 | 5,515 | 2,887 | 74 | 8,476 |
| Gonzales | 11,439 | 3,696 | 7,743 | 2,143 | 13,582 |
| Guadalupe | 24,854 | 6,636 | 18,218 | 2,574 | 27,428 |
| Karnes | 10,494 | 4,030 | 6,464 | 348 | 10,842 |
| Kendall | 5,868 | 1,052 | 4,816 | 33 | 5,901 |
| Kerr | 16,206 | 1,853 | 14,353 | 668 | 16,874 |
| Medina | 16,061 | 7,245 | 8,816 | 189 | 16,250 |
| Real | 1,637 | 323 | 1,314 | 6 | 1,643 |
| Wilson | 10,316 | 3,931 | 6,385 | 169 | 10,485 |
| TOTAL | | 330,831 | 428,981 | 59,252 | 819,064 |

Source: U.S. Census of 1970, Texas, PC(1) C & D reports.

2. These totals were first adjusted for undercount in the 1970 Census, as follows:

| Group | Factors * | Adjusted Totals |
|---|---|---|
| Spanish Surname | 12.5% | 330,831 + 41,354 = 372,185 |
| Anglo | 1.9% | 428,981 + 8,151 = 437,132 |
| Black & other Nonwhites | 7.7% | 59,252 + 4,562 = 63,814 |
| | | 873,131 |

TOTAL

\* Source: Comptroller General of the U.S., "Programs to Reduce the Dennial Census Undercount—Department of Commerce," Report to U.S. House of Representatives' Committee on Post Office and Civil Service, May 5, 1976. Although this report does not present an undercount factor for Spanish Surname persons, it calls attention to the problems contributing to serious undercount of minority populations in the South, including Texas; and it records the fact that Census Bureau has not issued an official estimate for Spanish origin groups. Informed professionals estimate the Mexican American undercount factor somewhere between 10 and 15 percent. Some of the reasons for this estimate are set forth in a U.S. Commission on Civil Rights publication, "Counting the Forgotten: the 1970 Census Count of Persons of Spanish Speaking Background in the United States," April 1974.

3. The adjusted totals were updated to 1978, according to the following "natural" increase factors. No estimates of immigration and emigration were included because the estimates were to be used for comparison with the jury pool, which assumes the U.S. citizenship and current residence in the U.S.

 a. Spanish surname: birth rate 30 minus death rate 10 = 20 persons added annually, per 1000 population, or a compound yearly increase factor of 2 percent. (Birth rate 30 is equivalent to a total fertility rate of 3.59 estimated on the basis of the child-woman ratio by age).

 b. Anglo: birth rate 17 minus death rate 10 = 7 persons added annually, per 1000 initial population, or a compound yearly increase of 0.7 percent. (Birth rate is equivalent to a total fertility rate of 2.39 estimated in the same way).

 c. Black and other nonwhite: birth rate 25 minus death rate 10 = 15 persons added annually, per 1000 initial population, or a compound yearly increase factor of 1.5 percent. (Birth rate is equivalent to a total fertility rate of 3.10 estimated in the same way).

The compound annual growth factors were applied as follows, with the final percentages indicated:

| | | |
|---|---|---|
| Spanish Surname | $(102.0)^8 \times 372{,}184 = 444{,}922$ | 45.4% |
| Anglo | $(100.7)^8 \times 437{,}132 = 462{,}215$ | 47.2% |
| Black & other nonwhite | $(101.5)^8 \times 63{,}814 = \underline{71{,}886}$ | <u>7.4%</u> |
| TOTAL | 979,023 | 100.0% |

Task 2: Can the Spanish surname data be converted to "Mexican American" and how would this be done?

It is widely known that almost all Spanish surname persons in the area of Texas concerned are of Mexican origin. In addition, there are persons of Mexican origin who do not have a Spanish surname, so that Spanish surname identifies only a certain portion of the Mexican American population. At present, the most effective designation other than Spanish surname is self-identification as "Mexican or Mexican American," in response to the census and current population survey question on "origin or descent." In 1975, the results of these two methods of identification were compared in U.S. Census Bureau Technical Paper No. 38, "Comparison of Persons of Spanish Surname and Persons of Spanish Origin in the United States," by Edward W. Fernandez. In this paper, on page 3, data are presented concerning the Southwestern States of Texas, California, Colorado, Arizona and New Mexico, showing that only 76 percent of persons self-identified as of Mexican origin have Spanish surnames, while 24 percent have a nonspanish surname. This would mean that 1/.76, or 1.32, times the number of Spanish surname people would yield the number of Mexican Americans. Since some persons with Spanish surnames are not self-identified as Mexican Americans, I have used an overall estimate of 1.25.

I have therefore applied the adjustment factor, 1.25, to the Spanish surname total (444,922), which results in 111,230 additional persons for Mexican-Americans, or a total of 556,152. The Anglo is then 350,985, and Mexican Americans are then 56.8% of the population.

Task 3: Should the same factor be applied to the jury pool and source listed data, if one is going to compare them to population data modified as in task 2?

Mr. Kairys has informed me that the information received concerning the jury pool composition is based on a 50% sample, or about half of the eligible individuals. The same correction should be made by adding 25 percent to the Spanish surname total of 28.7%, the result is 35.8%.